T.C. Memo. 2005-160

UNITED STATES TAX COURT

ROBERT C. DAVIS, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19813-03.                    Filed June 29, 2005.

Robert C. Davis, Jr., pro se.

<u>Jeffrey E. Gold</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following deficiency in, and additions to, petitioner's Federal income tax (tax):

|  |  | Additions to Tax | | |
| --- | --- | --- | --- | --- |
| Year | Deficiency | Sec. 6651(a)(1)[1] | Sec. 6651(a)(2) | Sec. 6654(a) |
| 2000 | $103,811 | $21,728.92 | $12,071.62 | $5,150.77 |

The issues remaining for decision are:

(1) Is petitioner entitled to deduct for 2000 a theft loss under section 165?  We hold that he is not.

(2) Is petitioner liable for 2000 for the addition to tax under section 6651(a)(1)?  We hold that he is.

(3) Is petitioner liable for 2000 for the addition to tax under section 6654(a)?  We hold that he is to the extent stated herein.

## FINDINGS OF FACT

Most of the facts have been stipulated by the parties and are so found.

At the time petitioner filed the petition in this case, he resided in Annapolis, Maryland.

On May 24, 2000, petitioner and June Davis (Ms. Davis), his wife, executed a contract (custom house contract) with Mona Builders & Developers, Inc., (Mona Builders).  That contract provided in pertinent part:

ARTICLE ONE -- THE WORK

MONA BUILDERS & DEVELOPERS, INC. [Mona Builders] shall perform all work required by the Contract Documents for

---

[1]All section references are to the Internal Revenue Code in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

the complete construction of the home described in the plans attached hereto and to be built on Lot #30 Perder Lane, South River Colony, Anne Arundel County, Maryland.  The lot is not part of this contract.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

ARTICLE FOUR -- CONTRACT SUM

The Owner [petitioner and Ms. Davis] shall pay to MONA BUILDERS & DEVELOPERS, INC. for the performance of the work, subject to additions and deductions by change order as provided in the General Conditions, in current funds, the sum of $935,000.00 (Nine Hundred Thirty Five Thousand Dollars).

ARTICLE FIVE -- PAYMENT

The Contract sum will be paid as follows:

| | | |
|---|---|---|
| 1. | Upon ratification of Contract. | $ 15,000.00 |
| 2. | Upon installation of foundation, 1st floor joists and decking installed. | 159,240.00 |
| 3. | Upon installation of exterior walls, roof sheathed and interior partitions framed. | 184,000.00 |
| 4. | Upon rough-ins of plumbing, mechanical and electric, roof shingles installed and installation of windows and doors. | 230,000.00 |
| 5. | Upon drywall being finished, exterior walls completed, and house trimmed out. | 230,000.00 |
| 6. | Upon plumbing, electrical, mechanical fixtures installed; kitchen cabinets installed; flooring installed; painting completed and approval by Anne Arundel County inspector. | 116,760.00 |
| | TOTAL | $ 935,000.00 |

MONA BUILDERS & DEVELOPERS, INC. will adhere to the lending institution's draw schedule; MONA BUILDERS & DEVELOPERS, INC. will be a named party on each draw

check.  The above is our standard draw schedule.  We would prefer 8 to 10 draw payments due to the amount of the contract.

ARTICLE SIX -- CHANGE ORDERS

1)   Every custom home has a few change orders.  As the project evolves, you will probably want to make some changes.  That's one of the great opportunities you have by custom building.  The Project Manager is available to discuss any changes you consider.  On average, change orders amount to 4-9% of the Proposal Price.  We suggest you plan accordingly.

         *         *         *         *         *         *         *

6)   Please note, a fee of 15% for overhead and profit will be added to the actual and/or estimated cost for all change orders.  The fee is waived for change orders that result in a credit.  [Handwritten addition.]  Upon substantial completion of the Contract, all amounts due to Owner as a credit shall be increased by 10% for reimbursement to Owner of overhead and profit previously included in the contract sum.

         *         *         *         *         *         *         *

ARTICLE ELEVEN -- MONA BUILDERS & DEVELOPERS, INC.

11.1 MONA BUILDERS & DEVELOPERS, INC. shall supervise and direct the Work, using best skill and attention. MONA BUILDERS & DEVELOPERS, INC., shall be solely responsible for all construction means, methods, techniques, sequences and procedures for coordinating all portions of the Work under the Contract.

         *         *         *         *         *         *         *

11.3 MONA BUILDERS & DEVELOPERS, INC. shall at all times enforce strict discipline and good order among employees, and shall not employ on the Work any unfit person or anyone not skilled in the task assigned to him.

         *         *         *         *         *         *         *

ARTICLE SEVENTEEN -- PAYMENTS

17.1 Payments shall be made as provided in Article five of this agreement.

17.2 Payments may be withheld on account of (1) defective Work not remedied, (2) claims filed, (3) failure of MONA BUILDERS & DEVELOPERS, INC. to make payments properly to Subcontractors for labor, materials, or equipment or (4) damage to another contractor.

17.3 The making of final payment shall constitute a waiver of all claims by the Owner except these arising from (1) unsettled liens, (2) faulty or defective Work discovered after Substantial Completion, (3) failure of the Work to comply with the requirements of the Contract Documents and code or (4) terms of any special guarantees required by the Contract Documents.  The acceptance of final payment shall constitute a waiver of all claims by MONA BUILDERS & DEVELOPERS, INC. except these previously made in writing and still unsettled.

    *       *       *       *       *       *       *

ARTICLE NINETEEN -- MONA BUILDERS & DEVELOPERS, INC. LIABILITY INSURANCE

MONA BUILDERS & DEVELOPERS, INC. shall purchase and maintain such insurance as will protect from claims under workman's compensation acts and other employee benefit acts, from claims for damages because of bodily injury, including death, and from claims for damages to property which may arise out of or result from MONA BUILDERS & DEVELOPERS, INC. operations under this Contract.

    *       *       *       *       *       *       *

ARTICLE TWENTY TWO -- CHANGES IN THE CONTRACT

22.1 The Purchaser [petitioner and Ms. Davis] without invalidating the Contract may order Changes in the Work consisting of additions, deletions, or modifications, the Contract Sum and the Contract Time being adjusted accordingly.  All such Changes in the Work shall be authorized by written Change Order signed by the Purchaser and Builder.

22.2 The Contract Sum and Contract Time may be changed only by Change Order.

22.3 The cost or credit to the Purchaser from a Change in the Work shall be determined by mutual agreement.

ARTICLE TWENTY THREE -- CORRECTION OF WORK

MONA BUILDERS & DEVELOPERS, INC. shall correct any Work that fails to conform to the requirements of the Contract Documents where such failure to conform appears during the progress of the Work, and shall remedy any defects due to faulty materials, equipment or workmanship which appear within a period of one year from the Date of Substantial Completion of the Contract or within such longer period of time as may be prescribed by law or by the terms of any applicable special guarantee required by the Contract Documents. The provisions of the Article Twenty Three apply to Work done by Subcontractors as well as to Work done by direct employees of MONA BUILDERS & DEVELOPERS, INC.

\* \* \* \* \* \* \*

ARTICLE TWENTY FIVE -- TERMINATION BY THE PURCHASER

If MONA BUILDERS & DEVELOPERS, INC. defaults or neglects to carry out the Work in accordance with the Contract Documents or fails to perform any major provisions of the Contract, the Purchaser may, after seven days written notice to MONA BUILDERS & DEVELOPERS, INC., and without prejudice to any other remedy he may have, make good such deficiencies and may deduct the cost thereof from the payment then or thereafter due MONA BUILDERS & DEVELOPERS, INC. or, at his option, may terminate the Contract.

At a time not disclosed by the record after petitioner and Ms. Davis executed the custom house contract, Mona Builders began construction of the house (custom house) described in that contract. Mona Builders obtained certain insurance policies from State Auto Property & Casualty Insurance Company (State Auto) in

order to maintain the insurance required by the custom house contract.

The workmanship in constructing the custom house was generally poor. In addition, during construction of the custom house Mona Builders (1) used in certain structural components of that house materials that were inferior to those required by the custom house contract and (2) failed to install certain other required structural components. (We shall refer to the inferior and missing structural components as the structural defects of the custom house.) As a result of the structural defects of the custom house, the custom house was structurally unsound.

On or about August 29, 2001, petitioner and Ms. Davis moved into the custom house. Thereafter, at the request of petitioner and Ms. Davis, Mona Builders continued to perform services in connection with finishing and repairing the custom house. On or about September 25, 2001, Mona Builders stopped work on the custom house.

Sometime after petitioner and Ms. Davis moved into the custom house, petitioner discovered the structural defects of the custom house.

In October 2001, Mona Builders commenced litigation in the Circuit Court for Anne Arundel County, Maryland (Maryland Circuit Court) against petitioner and Ms. Davis with respect to the custom house (custom house litigation) in which it sought payment

from them of $23,065. In December 2001, petitioner and Ms. Davis filed a counterclaim (custom house litigation counterclaim) in the custom house litigation in which petitioner and Ms. Davis alleged, inter alia, that Mona Builders violated the Maryland Custom Home Protection Act and breached the custom house contract.

On June 7, 2002, petitioner sent a letter (June 7, 2002 letter) by certified mail, return receipt requested, to State Auto. That letter stated in pertinent part:

> We are involved in litigation with Mona Builders and Developers, Inc. (Mona), the company that built our house. A copy of our Amended Counter-Complaint is attached. As part of that litigation, we recently discovered serious structural problems with our house. We have been told by our experts that Mona failed to build our house in compliance with the architectural drawings that were part of our agreement with them. At present we do not know the full extent of the problems, nor do we have cost estimates for necessary remedial action. * * *
>
> We understand that Mona purchased from the State Auto Insurance Companies a commercial general liability policy, and an excess liability umbrella policy, to cover the construction of our house. The number of those policies is PBP1005193. We do not know whether Mona has notified the State Auto Ins. Companies of the pending litigation and our claims against Mona.

(We shall refer to petitioner's claim to any of the proceeds from the insurance policies that State Auto issued to Mona Builders in connection with the construction of the custom house as petitioner's insurance claim.)

On November 8, 2002, petitioner and Ms. Davis sent a letter

(November 8, 2002 letter) to the Maryland Attorney General with respect to Mona Builders and the custom house. That letter stated in pertinent part:

> On May 24, 2000, we entered into a Contract with Mona Builders and Developers, Inc. (Mona), for the construction of a custom home on a lot we had previously purchased. The initial Contract price was $935,000. With change orders and upgrades, we paid more than $1,000,000 for the construction of our residence.
>
> We are currently in the midst of a civil suit against Mona. However, in spite of the disclosure requirements of the Custom Home Protection Act (CHPA), and tens of thousands of dollars expended in formal discovery efforts, Mona has yet to disclose the names and addresses of many of the suppliers and subcontractors who worked on our home. * * *
>
>     *       *       *       *       *       *       *
>
> We have been in our house for a little over one year, and are continuing to discover that Mona deviated very significantly and very seriously from the architectural plans we provided, and which were incorporated into our Contract. The house we paid Mona to build was not the house they constructed. Mona's misrepresentations, acts of malfeasance, and deliberate acts of fraud in building our home were, and continue to be, egregious.
>
> In summary, Mona deliberately and deceptively, without our knowledge or approval, failed to comply with the plans and specifications agreed to under our Contract. As a result of Mona's deliberate failure to adhere to our construction plans, our house is structurally unsound and unsafe. * * *
>
>     *       *       *       *       *       *       *
>
> Mona's acts of fraud go beyond the substitutions and omissions in the physical construction of our home. Information obtained through our discovery efforts suggest [sic] that Mona may have fraudulently altered a subcontractor's invoice, and may have fraudulently

overcharged us for materials and supplies. * * *

On February 3, 2003, State Auto commenced litigation in the Maryland Circuit Court against petitioner and Mona Builders (insurance litigation) in which it sought a declaratory judgment that petitioner's insurance claim was not covered by the insurance policies that State Auto had issued to Mona Builders. At a time not disclosed by the record after February 3, 2003, petitioner and Ms. Davis filed a second amended counterclaim[2] (insurance litigation counterclaim) in the insurance litigation in which they alleged, inter alia, that State Auto intentionally and negligently misrepresented the terms of certain insurance policies that State Auto had issued to Mona Builders with respect to the construction of the custom house. Petitioner and Ms. Davis alleged in the insurance litigation counterclaim:

> 33. After taking occupancy of the residence [custom house] in late August 2001, Davis [petitioner and Ms. Davis] discovered numerous items of defective or deficient work performed by MBD [Mona Builders] that resulted in damages throughout the residence to other parts of the residence. * * *

Petitioner did not file a tax return (return) for taxable year 2000. Nor did he file a return for any of the taxable years 1995, 1996, 1997, 1998, and 1999.[3] On March 20, 2003, respondent

---

[2]The record does not disclose any information about any counterclaim that petitioner and Ms. Davis filed in the insurance litigation before they filed the second amended counterclaim.

[3]Ms. Davis did not file a return for any of the taxable
(continued...)

prepared a substitute for return with respect to petitioner's taxable year 2000.

On April 11, 2003, petitioner filed a document entitled "Application for Statement of Charges" (April 11, 2003 application) with the District Court of Maryland for Anne Arundel County.  In that application, petitioner declared under oath:

> Between July 25, 2001 and Aug 8, 2001, Garrett Mona, Patrick Mona and Nick Mona intentionally misrepresented their intent to complete work on our [petitioner's and Ms. Davis'] house and repair defective work that existed at that time.  As a result of their intentional misrepresentations, we paid an additional $120,543.00 to them.  We discovered and confirmed the extent of the structural defects between July & Oct 2002.

On April 22, 2003, petitioner received a copy of a letter from the Department of Inspection and Permits, Anne Arundel County, in which it voided the certificate of occupancy that it had issued with respect to the custom house.

On May 1, 2003, petitioner and Mona Builders entered into a settlement agreement (May 1, 2003 settlement agreement) with respect to the custom house litigation.  As part of that settlement agreement, Mona Builders agreed to purchase the custom house from petitioner and Ms. Davis for $1,500,000.  On May 29, 2003, pursuant to the May 1, 2003 settlement agreement, petitioner and Ms. Davis transferred the custom house to Mona Builders in

---

[3](...continued)
years 1995, 1996, 1998, 1999, and 2000.

exchange for $1,500,000.

On August 20, 2003, respondent issued to petitioner a notice of deficiency (notice) with respect to petitioner's taxable year 2000. In that notice, respondent determined, inter alia, that petitioner is liable for the taxable year at issue for the respective additions to tax under sections 6651(a)(1) and 6654(a).

On October 26, 2004, respondent received Form 1040, U.S. Individual Income Tax Return, with respect to petitioner's taxable year 2000 (petitioner's Form 1040 for 2000), which respondent did not process as a return. In that form, petitioner, inter alia, claimed a $256,975 deduction under section 165 for a theft loss with respect to the custom house.

On November 1, 2004, a jury awarded petitioner and Ms. Davis $524,727 in compensatory damages (insurance litigation verdict) with respect to the insurance litigation counterclaim. The jury found, inter alia, that the property damages that petitioner and Ms. Davis sustained were not fully satisfied by the $1,500,000 paid to them pursuant to the May 1, 2003 settlement agreement. As of the time of the trial in this case, the Maryland Circuit Court was considering in the insurance litigation numerous posttrial motions and had not reduced the insurance litigation verdict to final judgment.

-13-

OPINION

We first address section 7491(a).  The parties agree that the examination in this case commenced after the effective date of section 7491.  The parties disagree, however, over whether the burden of proof shifts to respondent under that section.  Section 7491(a)(1) may shift the burden of proof to the Commissioner of Internal Revenue with respect to any factual issue relevant to determining the tax liability of a taxpayer provided that the taxpayer has introduced credible evidence with respect to any such issue and has complied with the applicable requirements of section 7491(a)(2).

As we understand petitioner's position under section 7491(a), he contends that he introduced credible evidence concerning the factual issues presented under section 165 (viz, when he discovered the alleged theft loss with respect to the custom house (alleged custom house theft loss) for which he is claiming a deduction for taxable year 2000; the amount of the alleged custom house theft loss; and the absence at the end of 2000 of a reasonable prospect of recovery of the alleged custom house theft loss) and that he complied with the applicable requirements of section 7491(a)(2).[4]  Therefore, according to petitioner, the

_____

[4]Petitioner also contends that he introduced credible evidence concerning the factual issue presented under sec. 6651(a)(1) (viz, whether he filed a return for taxable year 2000) and that the burden of proof shifts to respondent under sec.
(continued...)

burden of proof with respect to such factual issues shifts to respondent under section 7491(a)(1).

Respondent counters that petitioner has not introduced credible evidence concerning the factual issues presented under section 165 and that he has not complied with the applicable requirements of section 7491(a)(2).

Credible evidence is evidence which, after critical analysis, the Court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted.  Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).  Evidence is not credible if the Court is not convinced that such evidence is worthy of belief.  Id.

Petitioner relies on his testimony with respect to the factual issues presented under section 165.  As discussed below, we found petitioner's testimony regarding the time of his discov-

---

[4](...continued)
7491(a) with respect to the addition to tax under that section. Petitioner does not contend that he introduced credible evidence concerning the factual issues presented under sec. 6654(a) and that the burden of proof shifts to respondent under sec. 7491(a) with respect to the addition to tax under that section.  Even if petitioner were to advance such contentions with respect to sec. 6654(a), we would reject them, just as we reject petitioner's contention that the burden of proof with respect to the factual issue presented under sec. 6651(a)(1) shifts to respondent under sec. 7491(a).  That is because sec. 7491(a) does not apply to additions to tax and penalties under subtitle F of the Internal Revenue Code.  Higbee v. Commissioner, 116 T.C. 438, 447 n.6 (2001).

ery of the alleged custom house theft loss, the amount of the alleged custom house theft loss, and the absence at the end of 2000 of a reasonable prospect of recovery of the alleged custom house theft loss to be questionable, inconsistent with certain other evidence, conclusory, vague, and/or general. We shall not rely on such testimony to establish the facts with respect to such matters. On the record before us, we find that petitioner did not introduce credible evidence with respect to the factual issues presented under section 165. Having found that petitioner did not introduce credible evidence with respect to such factual issues, we need not resolve the dispute between the parties over whether petitioner has complied with the applicable requirements of section 7491(a)(2). On the record before us, we find that the burden of proof does not shift to respondent under section 7491(a)(1) with respect to any factual issues presented under section 165.

We turn next to whether petitioner is entitled to deduct under section 165 for taxable year 2000 the alleged custom house theft loss. Section 165(a) allows a deduction for any loss sustained during a taxable year and not compensated for by insurance or otherwise. Section 165(c)(3) limits the deduction allowed by section 165(a) in the case of an individual to a loss that arises from, inter alia, theft. The amount of a loss that a taxpayer is entitled to deduct under section 165 is the lesser of

(1) the difference between the fair market value of the property before the loss and the fair market value of the property after the loss, the latter value in the case of loss by theft being zero, or (2) the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of the property which was the subject of the loss. Sec. 165(b); secs. 1.165-7(b)(1), 1.165-8(c), Income Tax Regs. The basis for determining the amount of the deduction for any loss is the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of the property which was the subject of the loss. Sec. 165(b). With respect to a claimed theft loss, such loss is sustained during the taxable year in which a taxpayer discovers it. Sec. 165(e). Moreover, as we concluded in Viehweg v. Commissioner, 90 T.C. 1248, 1255-1256 (1988):

> If in the year of the discovery of the loss there
> exists a claim for reimbursement with respect to which
> there is a reasonable prospect of recovery, then there
> is no closed and completed transaction fixed by identi-
> fiable events and thus no deductible loss. * * *

A reasonable prospect of recovery exists when the taxpayer has a bona fide claim for recoupment and there is a substantial possibility that such claim will be decided favorably for the taxpayer. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975). Whether a reasonable prospect of recovery exists is determined as of the end of the

taxable year for which the deduction is claimed. Id.

Petitioner bears the burden of proving that the alleged custom house theft loss occurred and that the requirements of section 165 have been met. Allen v. Commissioner, 16 T.C. 163, 166-167 (1951). In order to carry his burden, petitioner must establish, inter alia, the existence of a theft within the meaning of section 165 and the amount of the claimed theft loss. See Elliott v. Commissioner, 40 T.C. 304, 311 (1963). Whether certain actions constitute theft for purposes of section 165 depends on the law defining the crime of theft in the jurisdiction where the alleged theft occurred. Monteleone v. Commissioner, 34 T.C. 688, 692 (1960).

It is petitioner's position that he is entitled to a deduction under section 165 for taxable year 2000 with respect to the alleged custom house theft loss in an unspecified amount in excess of the $256,975 deduction that he claimed in petitioner's Form 1040 for 2000. In support of that position, petitioner argues that (1) Mona Builders' actions with respect to the custom house constituted theft under applicable Maryland law; (2) petitioner discovered the alleged custom house theft loss in October 2000; (3) the amount of the alleged custom house theft loss exceeds by an unspecified amount the $256,975 theft loss that petitioner claimed as a deduction in petitioner's Form 1040 for 2000; and (4) petitioner did not have at the end of 2000 a

reasonable prospect of recovery of the alleged custom house theft loss.

It is respondent's position that petitioner is not entitled to a deduction under section 165 for taxable year 2000 with respect to the alleged custom house theft loss. In support of that position, respondent argues that petitioner has failed to carry his burden of establishing (1) that Mona Builders' actions with respect to the custom house constituted theft under applicable Maryland law; (2) that petitioner discovered the alleged custom house theft loss in October 2000 or at any other time in 2000; (3) the amount of the alleged custom house theft loss; and (4) that petitioner did not have at the end of 2000 a reasonable prospect of recovery of the alleged custom house theft loss.

In the instant case, the parties agree that the law of Maryland determines whether the actions of Mona Builders with respect to the custom house constituted theft. However, they disagree over whether such actions constituted theft under such law. We need not resolve that disagreement. That is because, assuming arguendo that we were to find that the actions of Mona Builders with respect to the custom house constituted theft under applicable Maryland law, on the instant record, we nonetheless would, and do below, reject petitioner's position that he is entitled to a deduction under section 165 for taxable year 2000 with respect to the alleged custom house theft loss.

With respect to when petitioner discovered the alleged custom house theft loss, petitioner claims that, because of the ongoing nature of Mona Builders' actions that resulted in the alleged custom house theft loss, he became aware of different aspects of that loss at different times. According to petitioner, for purposes of section 165 his discovery of the alleged custom house theft loss occurred in October 2000[5] when he claims he first became aware of certain aspects of that loss by determining that Mona Builders had (1) failed to give him credit for certain amounts by which the allowance for bricks in the custom house contract exceeded the amounts that Mona Builders actually paid for such bricks (alleged brick theft) and (2) not installed certain humidifiers as provided for in the custom house contract (alleged humidifier theft). Petitioner does not cite, and we have not found, any authority supporting petitioner's contention that for purposes of section 165 his discovery of the alleged custom house theft loss occurred when he first became aware of any aspect of that loss.

Assuming arguendo that petitioner had carried his burden of establishing that it is appropriate for purposes of section 165

---

[5]At trial, on direct examination petitioner testified that the alleged brick theft occurred in October 2004. According to petitioner, that was when he had a conversation with Mona Builders concerning the price that Mona Builders had charged Ms. Davis and petitioner for bricks used in the custom house. However, the record establishes that the custom house litigation counterclaim was settled in May 2003.

to treat the time when he first became aware of any aspect of the custom house theft loss as the time when he discovered such loss, we turn to petitioner's claim that he discovered the custom house theft loss in October 2000. In support of that claim, petitioner relies on his testimony with respect to the alleged brick theft and the alleged humidifier theft. We found petitioner's testimony regarding the alleged brick theft to be questionable and inconsistent with certain other testimony of petitioner. Petitioner testified:

> In October 2004,[6] we were discussing with Mona Builders the price that we had been charged and a payment we had made to them for bricks.
>
> The [custom house] contract specifies in the allowance paragraph that the bricks were supposed to be charged at $450,000. Excuse me. $450 per 1,000 bricks. At that point we knew that we had already just paid them for about 40,000 bricks.
>
> We visited the brick dealer because we recognized that the price we had been quoted by the brick subcontractor was $310 per 1,000. * * *
>
>    *       *       *       *       *       *       *
>
>   * * * Despite asking for them, we received no invoices certifying the price of the bricks, and the only way we were ultimately able to obtain those invoices was through the litigation that we started with Mona Builders over the problems with the house.
>
> When we received those invoices, they showed that the bricks were in fact charged that $310 per 1,000. [Emphasis added.]

---

[6] See supra note 5.

As we understand the foregoing testimony of petitioner, he claims that he became aware of the invoices detailing the price that Mona Builders had paid for the bricks used in the custom house as a result of the discovery that he conducted in connection with the custom house litigation counterclaim.[7]  Although the record does not disclose when discovery in the custom house litigation counterclaim began, such discovery could not have begun before petitioner filed that counterclaim in December 2001.[8]  Since petitioner claims that it was only as a result of discovery by him in connection with the custom house litigation counterclaim that he was able to obtain the information which led him to conclude that Mona Builders had overcharged him for

---

[7]Our understanding is consistent with the November 8, 2002 letter that petitioner and Ms. Davis sent to the Maryland Attorney General.  That letter stated in pertinent part:

> We are currently in the midst of a civil suit against Mona [custom house litigation counterclaim]. However, in spite of the disclosure requirements of the Custom Home Protection Act (CHPA), and tens of thousands of dollars expended in formal discovery efforts, Mona has yet to disclose the names and addresses of many of the suppliers and subcontractors who worked on our home. * * *

>     *        *        *        *        *        *        *

> * * * Information obtained through our discovery efforts suggest [sic] that Mona may have fraudulently altered a subcontractor's invoice, and may have fraudulently overcharged us for materials and supplies. * * *

[8]In October 2001, Mona Builders commenced the custom house litigation in which petitioner filed the custom house litigation counterclaim.

bricks, it would have been impossible for him to have obtained such information in 2000.

With respect to petitioner's testimony regarding the alleged humidifier theft, such testimony was vague as to when he became aware of that alleged theft. Indeed, petitioner did not even give a timeframe in such testimony. Petitioner's only testimony with respect to the alleged humidifier theft was that "We also were charged for humidifiers that were not installed. That was $1,000 that we asked for verification for and did not receive verification for."

On the record before us, we find that petitioner has failed to carry his burden of establishing that he became aware of the alleged brick theft and the alleged humidifier theft in October 2000 or at any time in that year.[9] On that record, we further

_____

[9]Petitioner declared under oath (petitioner's declaration) in the April 11, 2003 application filed with the District Court of Maryland for Anne Arundel County that "Between July 25, 2001 and Aug 8, 2001, Garrett Mona, Patrick Mona and Nick Mona intentionally misrepresented their intent to * * * repair defective work that existed at that time" in the custom house. That declaration indicates to us that petitioner became aware of certain unspecified defective work in the custom house sometime prior to his moving into that house around Aug. 29, 2001. We infer from petitioner's declaration in the April 11, 2003 application that petitioner became aware of certain defective work in the custom house sometime in the summer of 2001. That inference is consistent with other statements that petitioner made (1) in the April 11, 2003 application, (2) in the November 8, 2002 letter to the Maryland Attorney General, and (3) in the insurance litigation counterclaim. Petitioner's declaration in the April 11, 2003 application does not evidence that petitioner became aware of any defective work in the custom house in 2000.

find that petitioner has failed to carry his burden of establishing that he discovered the alleged custom house theft loss in October 2000 or at any other time in that year.

Assuming arguendo that petitioner had carried his burden of establishing that he discovered the alleged custom house theft loss in 2000, we turn to whether petitioner established the amount of the alleged custom house theft loss which he claims he is entitled to deduct under section 165. As discussed above, the amount of a loss that a taxpayer is entitled to deduct under section 165 is the lesser of (1) the difference between the fair market value of the property before the loss and the fair market value of the property after the loss, the latter value in the case of loss by theft being zero, or (2) the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of the property which was the subject of the loss. Sec. 165(b); secs. 1.165-7(b)(1), 1.165-8(c), Income Tax Regs.

With respect to the fair market value of the custom house before the alleged custom house theft, petitioner introduced an appraisal report prepared by Robert H. Campbell & Associates, LLC, that was dated October 28, 2002 (October 28, 2002 appraisal report) and that was prepared and provided to petitioner in connection with the custom house litigation counterclaim. That appraisal report did not purport to establish the fair market

value of the custom house before the time in October 2000 when petitioner alleges he discovered certain aspects of the alleged custom house theft. Instead, the October 28, 2002 appraisal report purported to determine the diminished value of the custom house as of October 1, 2002.

With respect to the adjusted basis of Ms. Davis and petitioner in the custom house, in the November 8, 2002 letter that Ms. Davis and petitioner sent to the Maryland Attorney General, they stated that they paid more than $1 million for the custom house. Petitioner failed to introduce any evidence that corroborated that statement. Nor did petitioner introduce any evidence that otherwise established the adjusted basis of Ms. Davis and himself in the custom house (or in any property that was part of the custom house and that was allegedly stolen, including the bricks and humidifiers that were the subject of the alleged brick theft and the alleged humidifier theft).

On the record before us, we find that petitioner has failed to carry his burden of establishing the fair market value of the custom house before the time in October 2000 when petitioner alleges he discovered certain aspects of the alleged custom house theft and the adjusted basis of Ms. Davis and petitioner in the custom house (or in any property that was part of the custom house). On that record, we further find that petitioner has failed to carry his burden of establishing the amount of the loss

which he claims he is entitled to deduct under section 165.

Assuming arguendo that petitioner had carried his burden of showing (1) that he discovered the alleged custom house theft loss in 2000 and (2) the amount of the loss which he claims he is entitled to deduct under section 165, we turn now to whether at the end of 2000 petitioner had a reasonable prospect of recovery of the alleged custom house theft loss. The determination of whether there is a reasonable prospect of recovery is made upon facts known or reasonably foreseeable at the end of the taxable year for which the theft loss deduction is claimed. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. at 811-812.

At trial, petitioner testified that as a result of the discovery that he conducted in connection with the custom house litigation counterclaim he became aware that Mona Builders had only $75,000 in assets and was thinly capitalized (Mona Builders' alleged financial condition). Based on that testimony, petitioner argues that Mona Builders was always thinly capitalized and that therefore petitioner never had a reasonable prospect of recovery from Mona Builders of the alleged custom house theft loss.

We found petitioner's testimony with respect to Mona Builders' alleged financial condition to be questionable, conclusory, vague, and general. That testimony also appeared to be inconsistent with Mona Builders' ability on May 29, 2003, to purchase the

custom house from petitioner and Ms. Davis for $1,500,000. Even if we were to accept petitioner's testimony about Mona Builders' alleged financial condition, the argument that petitioner advances based on such testimony assumes that Mona Builders' alleged financial condition requires the conclusion that petitioner did not have a reasonable prospect of recovery of the alleged custom house theft loss. That Mona Builders may have had only $75,000 in assets and/or been thinly capitalized does not require the conclusion that petitioner did not have a reasonable prospect of recovery of the alleged custom house theft loss.

Assuming arguendo that we were to accept petitioner's testimony regarding Mona Builders' alleged financial condition, on the record before us, we find that petitioner did not carry his burden of establishing that at the end of 2000 he did not have a reasonable prospect of recovery of the alleged custom house theft loss (or any portion thereof, including the alleged brick theft and the alleged humidifier theft) by, for example, withholding future payments to Mona Builders under article seventeen of the custom house contract, requiring Mona Builders to correct its work under article twenty-three of that contract, or terminating the custom house contract under article twenty-five and suing Mona Builders for breach of contract. On that record, we further find that petitioner did not carry his burden of establishing that at the end of 2000 he did not have a reason-

able prospect of recovery of the alleged custom house theft loss (or any portion thereof).

Based upon our examination of the entire record before us, we find that petitioner has failed to carry his burden of establishing that he is entitled to a deduction under section 165 for taxable year 2000 with respect to the alleged custom house theft loss (or any portion thereof).

We turn next to whether petitioner is liable for the addition to tax under section 6651(a)(1). Section 6651(a)(1) imposes an addition to tax for failure to file a return on the date prescribed for filing, unless petitioner proves that such failure to file was due to reasonable cause, and not willful neglect. Sec. 6651(a)(1); Higbee v. Commissioner, 116 T.C. at 447.

Respondent must carry the burden of production with respect to the addition to tax under section 6651(a)(1). Sec. 7491(c); Higbee v. Commissioner, supra at 446-447. To satisfy respondent's burden of production, respondent must come forward with "sufficient evidence indicating that it is appropriate to impose" the addition to tax. Higbee v. Commissioner, supra at 446.

We have found that petitioner did not file a return for taxable year 2000.[10] In finding that petitioner did not file a

_____

[10]We have also found (1) that petitioner did not file a return for any of the taxable years 1995, 1996, 1997, 1998, and 1999 and (2) that Ms. Davis did not file a return for any of the taxable years 1995, 1996, 1998, 1999, and 2000. Respondent
(continued...)

return for taxable year 2000, we reject petitioner's uncorroborated and questionable testimony that on August 10, 2001, he mailed petitioner's Form 1040 for 2000 to respondent by depositing such form in a mailbox.[11]

Based upon our examination of the entire record before us, we find that respondent has carried respondent's burden of production under section 7491(c) with respect to the addition to tax under section 6651(a)(1) that respondent determined in the notice.

Petitioner introduced no evidence and advances no argument that his failure to file a return for 2000 was due to reasonable cause, and not willful neglect.

Based upon our examination of the entire record before us, we find that petitioner has failed to carry his burden of showing that his failure to file a return for taxable year 2000 was due to reasonable cause, and not willful neglect. Based upon that

---

[10](...continued)
introduced respective Forms 3050, Certification of Lack of Record (Forms 3050), for petitioner's taxable years 1995 through 2000 and Ms. Davis's taxable years 1995, 1996, 1998, 1999, and 2000. Absent a showing of some irregularity in such Forms 3050, which petitioner has not made, we may rely on such forms. See, e.g., Davis v. Commissioner, 115 T.C. 35, 40-41 (2000).

[11]It is noteworthy that petitioner, an attorney, was aware of the importance of using certified mail in connection with mailing important documents. Indeed, petitioner sent the June 7, 2002 letter notifying State Auto of petitioner's insurance claim by certified mail, return receipt requested.

examination, we further find that petitioner has failed to carry his burden of demonstrating error in respondent's determination that he is liable for taxable year 2000 for the addition to tax under section 6651(a)(1).

We turn finally to whether petitioner is liable for the addition to tax under section 6654(a). Section 6654(a) imposes an addition to tax in the case of an underpayment of estimated tax by an individual.

Respondent has the burden of production with respect to the addition to tax under section 6654(a).[12] Sec. 7491(c); Higbee v. Commissioner, supra at 446-447. We find that the record contains evidence from which the parties, in the computations under Rule 155, will be able to calculate the amount of any required installment by petitioner within the meaning of section 6654(d)(1) with respect to taxable year 2000 and the amount, if any, of an underpayment of estimated tax for that year. In the event that such calculation were to establish that petitioner underpaid his

_____

[12]For purposes of sec. 6654(a), it is necessary to determine whether there is an underpayment of a required installment of estimated tax. See sec. 6654(a) and (b). In this connection, the amount of any required installment is 25 percent of the required annual payment. Sec. 6654(d)(1)(A). The required annual payment is equal to the lesser of (1) 90 percent of the tax shown in the return for the taxable year or, if no return was filed, 90 percent of the tax for such year, or (2) if the individual filed a return for the preceding taxable year, 100 percent of the tax shown in such return. Sec. 6654(d)(1)(B). We have found that petitioner did not file a return for 2000, the taxable year at issue, or for 1999, the preceding taxable year.

estimated tax for taxable year 2000, we find that respondent has satisfied respondent's burden of production with respect to the addition to tax under section 6654(a) for that year.  In that event, we further find on the instant record (1) that none of the exceptions in section 6654(e) applies[13] and (2) that petitioner is liable for the addition to tax under section 6654(a) for taxable year 2000.

In the event that the calculation relating to section 6654 were to establish that petitioner did not underpay his estimated tax for taxable year 2000, we find that respondent has not satisfied respondent's burden of production with respect to the addition to tax under section 6654(a) for that year and that petitioner is not liable for such addition to tax.

We have considered all of the contentions and arguments of petitioner that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[13]Petitioner does not take the position that one or more of the exceptions in sec. 6654(e) apply in the instant case.